UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-20304-ALTMAN/Reid

ZAGG INC.,

      *Plaintiff,*

*v.*

MENACHEM MENDEL ICHILEVICI, *et al.*,

      *Defendants.*

_____/

DVG TRADE LLC,

      *Counter-Plaintiff,*

*v.*

ZAGG INC., *et al.*,

      *Counter-Defendants.*

_____/

## OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Our parties, ZAGG and DVG, have both moved for summary judgment on all their various claims and counterclaims.[1] *See* Plaintiffs' Motion for Summary Judgment ("Pla. MSJ") [ECF No. 308]; Defendants' Motion for Summary Judgment ("Def. MSJ") [ECF No. 317]. Both MSJs have been fully briefed and are ripe for adjudication. *See* Response to Pla. MSJ ("Def. Response") [ECF No. 329]; Reply in Support of Pla. MSJ ("Pla. Reply") [ECF No. 335]; Response to Def. MSJ ("Pla. Response") [ECF No. 329]; Reply in Support of Def. MSJ ("Def. Reply") [ECF No. 338]. After careful review, we

---

[1] For ease of reference, we'll generally refer to ZAGG, Inc., Screenya, LLC, Brendan Buckner, and Merril Longmore as the "Plaintiffs" or "ZAGG"—and to DVG Trade LLC, Menachem Mendel Ichilevici, and TX Trading, Inc. as the "Defendants" or "DVG."

**GRANT in part** and **DENY in part** the Plaintiffs' MSJ and **GRANT in part** and **DENY in part** the Defendants' MSJ.

THE FACTS

ZAGG "designs, manufactures, and sells a variety of screen protectors, power management solutions, mobile keyboards, cases, and personal audio products under the ZAGG, Invisible Shield, IFROGZ, mophie, Gear4, and BRAVEN brands." Plaintiffs' Statement of Material Facts ("PSMF") [ECF No. 307] ¶ 1; *see also* Defendants' Response to PSMF ("PSMF Response") [ECF No. 330] ¶ 1 ("Undisputed."). DVG is also in the electronics accessories industry: It "resell[s] various consumer products [including ZAGG products] through an Amazon storefront having the name 'Mac N' Cheese.'" Defendants' Statement of Material Facts ("DSMF") [ECF No. 310] ¶ 1; *see also* Plaintiffs' Response to DSMF ("DSMF Response") [ECF No. 327] ¶ 1 (undisputed in relevant part).

In our case, ZAGG filed a Complaint accusing DVG of selling used ZAGG products on Amazon while falsely advertising that the products were "New." *ZAGG Inc. v. Ichilevici*, 2024 WL 3874584, at *2 (S.D. Fla. Aug. 20, 2024) (Altman, J.) ("According to ZAGG, Defendant Ichilevici 'acts by and through Defendants DVG Trade and TX Trading to own and operate the Mac N' Cheese Amazon Seller Account through which Defendants advertise and sell ZAGG Products.' . . . ZAGG accuses the Defendants of 'representing that the ZAGG Products they offer for sale on the Internet are new'—even though 'the products actually sold by the Defendants and received by the consumers are in used, rather than new condition.'" (cleaned up) (quoting Second Amended Complaint ("SAC") [ECF No. 26] ¶¶ 15, 43)). ZAGG's SAC asserts three claims against DVG: (1) trademark counterfeiting and infringement, in violation of 15 U.S.C. § 1114; (2) unfair competition and false designation of origin, in violation of 15 U.S.C. § 1125(a); and (3) piercing the corporate veil and alter-ego liability against Defendants TX Trading and DVG. *See* SAC ¶¶ 82–111.

In its response to ZAGG's complaint, DVG asserts five counterclaims against ZAGG and three other Counter-Defendants: Screenya, ZAGG's wholly-owned subsidiary; Brendan Buckner, ZAGG's former tax director and the former director of Screenya's operations; and Merril Longmore, ZAGG's director of ecommerce. *See* DVG Counterclaims [ECF No. 41] ¶¶ 2–7. We dismissed one of DVG's counterclaims—false advertising under the Lanham Act—but allowed four others to proceed. *See ZAGG*, 2024 WL 3874584, at *12. DVG's surviving counterclaims are: (1) "a declaratory-judgment claim, asking us to declare 'that it has never infringed on any of ZAGG's purported trademarks, and in particular, that its purchase and resale of products . . . are lawful under the first-sale doctrine'"; (2) "a claim of defamation *per se* under Florida law against ZAGG and Longmore"; (3) "a claim of civil conspiracy against all the Counter-Defendants"; and (4) "a claim under the Florida Deceptive and Unfair Trade Practices Act ('FDUTPA') against all the Counter-Defendants." *Id.* at *3 (cleaned up).

In response, Screenya filed its own counterclaims against DVG. *See generally* Screenya Counterclaims [ECF No. 216]. Screenya alleges that DVG engaged in false advertising under 15 U.S.C. § 1125(a) and that it's violated FDUTPA by advertising the ZAGG products it sells as "New," even though DVG knows "that its products come from liquidation sources." *Id.* at 15. DVG filed a motion to strike or dismiss these counterclaims, which we denied. *See ZAGG Inc. v. Ichilevici*, 2024 WL 5186468, at *7 (S.D. Fla. Dec. 20, 2024) (Altman, J.) ("We'll therefore allow Screenya to assert its counterclaims under the Lanham Act and FDUTPA").

Now, both parties have moved for summary judgment as to every claim. *See generally* Pla. MSJ; Def. MSJ. And despite each party characterizing its statement of facts as "undisputed," the parties agree on very little. *See generally* PSMF Response; DSMF Response (both disputing nearly every one of the other party's facts). We'll address each MSJ in turn.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the

4

record." (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

## I.    ZAGG's Motion for Summary Judgment

### a.    ZAGG and Screenya's False-Advertising Claims

Both ZAGG and Screenya allege that DVG violated the Lanham Act by engaging in false advertising. *See* SAC ¶ 1 ("ZAGG seeks injunctive relief and monetary damages for Defendants' trademark counterfeiting and infringement, *false advertising*, and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*" (emphasis added)); Screenya Counterclaims ¶ 51 ("By selling or distributing products using the ZAGG Marks as alleged herein, Defendant is engaging in unfair competition and *false advertising* in violation of 15 U.S.C. § 1125(a)." (emphasis added)).[2] To succeed

---

[2] DVG argues that ZAGG didn't actually plead a false-advertising claim in its SAC. *See* Def. Response at 21 ("Aware that its trademark infringement claims were untenable, ZAGG has attempted to recast its case as one for 'false advertising.' But ZAGG should not be permitted to introduce a new legal claim in briefing that is not included in its SAC."). We disagree. ZAGG's SAC is replete with allegations that DVG falsely advertises its products. *See, e.g.*, SAC ¶ 1 ("ZAGG seeks injunctive relief and monetary damages for Defendants' trademark counterfeiting and infringement, false advertising, and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*"); *id.* ¶ 7 ("This action seeks

on a false-advertising claim under the Lanham Act, a plaintiff must establish five elements: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be— injured as a result of the false advertising." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1316 (11th Cir. 2020) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

"The first element of a false advertising claim is satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading. When determining whether an advertisement is literally false or misleading, courts must analyze the message conveyed in full context, and must view the face of the statement in its entirety." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (cleaned up). "Once a court deems an advertisement to be literally false, the movant need not present evidence of [the second element] consumer deception." *Johnson & Johnson*, 299 F.3d at 1247. But "[e]ven when a court finds that a defendant's ads are literally false, the plaintiff . . . must still establish that the defendant's deception is likely to influence the purchasing decision. The materiality requirement is based on the premise that not all deceptions affect consumer decisions." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (cleaned up).

In ZAGG's view, DVG's claim that its products are "New" when they're actually "ZAGG products of unknown origin purchased in a liquidation pallet from a wholesaler" is "literally false" for two reasons. Pla. MSJ at 16–17. *First*, ZAGG says that DVG's advertisements are false because

---

permanent injunctive relief and damages for Defendants' trademark counterfeiting and infringement, false advertising, and unfair competition."); *id.* ¶ 69 ("ZAGG notified Defendants of their trademark counterfeiting and infringement, false advertising, and other improper conduct on multiple occasions[.]").

"Amazon's guidelines require a product listed for sale as in 'New' condition to be 'brand new' and [ ] covered by a manufacturer's warranty." *Id.* at 14. *Second*, ZAGG tells us that "it is axiomatic that products of unknown origin purchased at a liquidation sale do not equal 'New' products, and cannot be advertised as such to consumers." *Id.* at 17. DVG rebuts both arguments.[3] *First*, DVG alleges that ZAGG has misstated Amazon's policies and that "Amazon does not require (and never has required) that an item include the 'manufacturer's warranty' to be offered for sale as 'new' on the Amazon marketplace." Def. Response at 22. *Second*, DVG argues that ZAGG's attorneys have "fabricated" the "notion that liquidated products are not new products." *Id.* at 23 (cleaned up).[4] We'll address each of ZAGG's theories of falsity in order.

### 1. Amazon Condition Guidelines

ZAGG's first argument is that DVG falsely advertises its products by claiming that they're in "New" condition even though they aren't covered by ZAGG's warranty. *See* Pla. MSJ at 14. ZAGG tells us that Amazon's "Condition Guidelines" define "New" as: "Just like it sounds. A brand-new item. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments. Original packaging is present for most New items but certain items like shoes may be re-boxed." PSMF ¶ 77 (citing Declaration of Merril Longmore ("Longmore Decl.") Exh. E [ECF No. 307-1] at 25). Exhibit E to the Longmore Declaration is a screenshot of Amazon's Condition

---

[3] DVG concedes that its products aren't sourced directly from ZAGG. *See* DSMF ¶ 103 (conceding that DVG isn't an "authorized reseller" of ZAGG products); *see also* PSMF Response ¶ 35 ("Undisputed" that DVG sources its ZAGG products exclusively from a wholesale liquidator).

[4] DVG also responds to (what it perceives to be) two other "theories" of ZAGG's case. *See id.* at 21 ("As best understood, Plaintiffs assert that DVG has engaged in 'false advertising' under four theories. . . . (3) Plaintiffs purportedly received 'used or opened' ZAGG Products from DVG; and (4) Plaintiffs purportedly received ZAGG Products from DVG that had a different SKU/model number than advertised."). But these aren't alternative theories of ZAGG's false-advertising claim. ZAGG's MSJ makes clear that it's using these test purchases to buttress its overarching theory that liquidated products cannot be considered "New." *See* Pla. MSJ at 18 ("Moreover, the evidence in the case demonstrates exactly why product of unknown origin cannot be advertised as in 'New' condition. Test purchases of Defendants' ZAGG Products confirmed that they were used or opened, and/or had a SKU/model number different than advertised.").

Guidelines, apparently captured on December 10, 2024. *See generally* Longmore Decl. Exh. E. And the guidelines in Exhibit E define "New" products exactly as ZAGG describes them. *Ibid.*

DVG vehemently disputes ZAGG's characterization of Amazon's policies. *See* PSMF Response ¶ 77 ("Disputed. No reasonable fact finder could agree that Amazon's 'definition' of what constitutes a 'New' product is shown in Exhibit E. The applicable policy of what is required to list products as 'New' on Amazon can be found in the FBA Guidelines and on Seller Central—these policies simply require that the item is brand-new and unused, free of blemishes, smudges or dirt, and in the original packaging." (citing the Expert Report of Rachel Johnson Greer (the "Greer Report") [ECF No. 311-1])); *see also* Def. Response at 22 ("ZAGG's position would require multiple, factually unsupported, leaps. . . . Amazon does not require (and never has required) that an item include the 'manufacturer's warranty' to be offered for sale as 'new' on the Amazon marketplace." (emphasis removed)). DVG's expert on Amazon's policies, Rachel Greer, claims that the Amazon Condition Guidelines ZAGG relies on are "outdated" and that Amazon's *actual* policy only states that "New" means "[j]ust like it sounds—. . . a brand-new item." Greer Report at 11. Greer goes on to tell us that "it has always been understood that a 'new' item is simply one that is brand-new and unused, free of blemishes, smudges or dirt, and in the original packaging. This is confirmed by other Amazon policy documents[.]" *Ibid.*

In its Reply, ZAGG maintains that *it* has the correct reading of Amazon's policies, and that Greer is wrong. *See* Pla. Reply at 8 ("The Amazon definition of 'New' is very clear, and requires that the product be genuine, in its original packaging, in brand-new condition, and carry the manufacturer's warranty."). In support of its position, ZAGG cites a District of Colorado case that (it claims) granted summary judgment for the plaintiff in nearly identical circumstances. *See* Pla. MSJ at 19 (citing *Otter Prods., LLC v. Triplenet Pricing Inc.*, 572 F. Supp. 3d 1066, 1077 (D. Colo. 2021)). ZAGG tells us that the court in *Otter Products* "grant[ed] summary judgment where [an] unauthorized reseller represented

mobile phone accessories as 'New' on Amazon though the manufacturer's warranty did not attach." *Ibid.* But that's not exactly right: The court in *Otter Products* didn't grant summary judgment on the plaintiff's false-advertising claim *merely because* the defendant labeled its products on Amazon as "New," despite the inapplicability of the manufacturer's warranty. Instead, the district court found that the plaintiff was entitled to summary judgment on its false-advertising claim because the defendant had explicitly claimed that its products were covered by the plaintiff's manufacturer's warranty, when, in fact, they were not. *See Otter Prods.*, 572 F. Supp. 3d at 1077 ("Triplenet has also admitted, however, that the listing of Otter Products on the Triplenet Amazon website states: 'Includes OtterBox limited lifetime warranty.' . . . Because Triplenet represented that its products are covered by the Otter Warranty when those products are, in fact, not covered by the Otter Warranty, Triplenet made literally false or misleading statements.").

This is very different from our case. Here, DVG doesn't claim that its products are covered by ZAGG's warranty. Quite the opposite: DVG notifies purchasers that "it is not an authorized reseller" of ZAGG products and urges them to "check with the manufacturer to see if a warranty may apply." Def. Response at 22. (quotations omitted). So, *Otter Products* doesn't resolve the key issue before us—whether DVG's identification of its products as "New" is literally false under Amazon's policies—which means we're left with two competing interpretations of Amazon's policies.

Whether Amazon requires products listed as "New" to carry the original manufacturer's warranty is thus a disputed question of material fact we'll let the jury resolve. We therefore **DENY** this portion of ZAGG's MSJ.

### 2.  ZAGG's "Liquidation" Theory

ZAGG also claims that DVG's designation of its products as "New" constitutes false advertising because DVG's products are "of unknown origin purchased in a liquidation pallet from a wholesaler who also purchased them at a liquidation sale from another entity." Pla. MSJ at 17.

According to ZAGG, it's "axiomatic that products of unknown origin purchased at a liquidation sale do not equal 'New' products." *Ibid.* The thrust of ZAGG's argument is that, because DVG can't "verify the full chain of custody or history of each individual item," it can't confirm that it's actually selling "brand new" items. *Ibid.* In its Response, DVG says that the "Plaintiffs' liquidation theory is premised on the (fabricated) notion that liquidated products are not New products. But there is simply no factual support for Plaintiffs' allegation that a reasonable consumer would exclude from the commonly understood English language definition of new all liquidation or product of an unknown source and origin." Def. Response at 23 (cleaned up).

In support of its theory that liquidation products can *never* be "New," ZAGG cites an unpublished report and recommendation from a magistrate judge in the Eastern District of Michigan and *claims* that, "[a]t summary judgment, the [c]ourt [in that case] ruled, *inter alia*, that defendant's 'lack of knowledge as to the initial source of the goods' prevented it from offering evidence that the products were in 'New' condition." Pla. MSJ at 18–19 (quoting *RFA Brands, LLC v. Beauvais*, 2014 WL 7780975, at *8 (E.D. Mich. Dec. 23, 2014), *report and recommendation adopted*, 2015 WL 519166 (E.D. Mich. Feb. 9, 2015)). But that's not what happened in *RFA Brands*. For one thing, *RFA Brands* didn't "rule" that the defendant couldn't advertise its goods as "New" *because of* its "lack of knowledge as to the initial source of [its] goods[.]" *That* language, which ZAGG quotes as if it came from the magistrate judge's recommendation, is *actually* from the judge's explanation of the *plaintiffs'* position. *See RFA Brands*, 2014 WL 7780975, at *8 ("*Plaintiffs contend* that defendant's storage locker contention signifies, at best, a lack of knowledge as to the initial source of the goods." (emphasis added)). For another, the defendant's "lack of knowledge" as to the origin of its products had very little to do with the magistrate judge's decision to recommend summary judgment on the plaintiffs' false-advertising claim. Instead, the judge in *RFA Brands* recommended that the court grant summary judgment on the plaintiffs' false-advertising claim because it found that the defendant: (1) sold *used and returned* products as "New"; (2)

admitted to opening the packaging of every product it sold, thus "render[ing] the products not new"; and (3) "offered no response to plaintiffs' argument that this conduct established liability for false advertising." *Ibid.* That's all very different from our case. Unlike the defendant in *RFA Brands*, DVG *doesn't* concede that it opens every "New" product it sells. And, contra the defendant in *RFA Brands*, DVG *has* responded to ZAGG's claims that DVG falsely advertises the condition of its products. *See* Def. Response at 24 ("Common sense dictates that a person can buy a 'new' product, even if it is part of a closeout sale or even if the chain of custody is not known.").

So, while ZAGG characterizes its contentions as "axiomatic," it offers no authority for its view that products DVG purchased at a liquidation sale can *never* be advertised as new—nor have we found any such cases. Pla. MSJ at 17. And, because "[l]iteral falsity is a finding of fact," *Osmose*, 612 F.3d at 1309, we'll let a jury decide whether DVG's liquidated products can be considered "New."[5]

Because ZAGG has failed to establish the first element of its false-advertising claims—*viz.*, that DVG's advertisements are literally false—we **DENY** its request for summary judgment on its false-advertising claims.[6]

### b. ZAGG's Trademark-Infringement Claims

ZAGG next argues that it's entitled to summary judgment on its trademark-infringement claims. *See* Pla. MSJ at 22 ("Defendants resale of ZAGG Product is exactly the type of conduct meant to be unlawful under trademark law as Defendants' action negatively impact both consumers and the

---

[5] In its Reply, ZAGG directs us to a Central District of California case in which the court entered judgment against an infringing defendant who was allegedly "offering for sale 'new' Corsair Products, but [ ] instead fulfilling orders with liquidated, used, or non-genuine product of unknown origin bearing the Corsair Marks." *Corsair Gaming, Inc. v. Sambi LLC*, 2025 WL 2094010, at *9 (N.D. Cal. May 19, 2025), *report and recommendation adopted*, 2025 WL 2094000 (N.D. Cal. July 11, 2025). While the *Corsair* Court's language admittedly tracks the contours of ZAGG's claim, the court entered judgment in that case after the defendant's default. In other words, the *Corsair* Court asked only whether the plaintiff had sufficiently *pled* its cause of action—not, as we must do here, whether it had successfully *proven* that cause of action. The case is thus of little value to us here.

[6] Because there's a genuine issue of material fact on the first element of ZAGG's false-advertising claims, we needn't address the parties' arguments on the remaining elements.

ZAGG brand name."). ZAGG's SAC asserts two counts under the Lanham Act—Count I for trademark infringement under 15 U.S.C. § 1114 (§ 32(1) of the Lanham Act) and Count II for unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act). *See* SAC ¶¶ 82–102.

"To prevail on a claim of trademark infringement [under § 32(1)] plaintiffs must establish: (1) that they possess a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred in commerce, (4) that the defendants used the mark in connection with the sale . . . or advertising of any goods, and (5) that the defendants used the mark in a manner likely to confuse consumers." *N. Am. Med. Corp.*, 522 F.3d at 1218 (cleaned up). "To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018) (citation omitted).

While claims under these two sections of the Lanham Act are technically distinct, courts typically analyze them together. *See Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017) ("We, like other circuits, often blur the lines between § 1114 claims and § 1125 claims because recovery under both generally turns on the confusion analysis."); *see also Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1050 (10th Cir. 2008) ("Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together as an action[.]"). And we'll do the same. After all, ZAGG's trademark over the ZAGG marks is undisputed. *See* PSMF ¶ 2 ("ZAGG owns U.S. Trademark Reg. Nos. 4,137,585 and 4,634,052 for use of the mark ZAGG."); *see also* PSMF Response ¶ 2 ("Undisputed."). And it's undisputed that DVG uses the ZAGG mark in commerce by selling ZAGG "products via its 'Mac N' Cheese' Amazon Seller Account." PSMF ¶ 27; *see also* PSMF Response ¶ 27 ("Undisputed

that DVG has sold certain ZAGG-branded products through the 'Mac N' Cheese' Amazon storefront."). Both trademark-infringement claims, therefore, will turn on whether DVG's use of ZAGG's trademarks are "likely to cause consumer confusion" as to the origin or source of the purchased goods. *Savannah Coll. of Art*, 872 F.3d at 1261 (quoting *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007)).

ZAGG argues that DVG's product listings create confusion because it lists its products as "New" when they are in fact of an "unknown origin and purchased in large pallets at liquidation sales." Pla. MSJ at 24. DVG counters that the "first-sale doctrine" precludes ZAGG's trademark-infringement claims. *See* Def. Response at 12. According to DVG, its mere acquisition and resale of genuine ZAGG products *can't* constitute trademark infringement because, under the first-sale doctrine, "the resale of genuine trademarked goods generally does not constitute infringement." *Id.* at 17 (quoting *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001)). In its Reply, ZAGG contends that the first-sale doctrine is inapplicable here because (1) DVG cannot show "a legitimate first sale" and (2) many of the products DVG sells have been "materially altered." Pla. Reply at 6–7. Because ZAGG's trademark-infringement claims turn on the applicability of the first-sale doctrine, we'll focus our analysis there.

### 1. The First-Sale Doctrine

As DVG correctly observes, under the first-sale doctrine, "the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product. Therefore, even though a subsequent sale is without a trademark owner's consent, the resale of a genuine good does not violate the Act." *Davidoff*, 263 F.3d at 1031 (cleaned up); *see also Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1353 (S.D. Fla. 2012) (Cohn, J.) ("Under the 'first sale doctrine,' the resale of genuine trademarked goods does not generally constitute trademark infringement." (quoting *Davidoff*, 263 F.3d at 1031)).

### i.     Valid First Sale

ZAGG's first argument against DVG's reliance on the first-sale doctrine is that DVG has failed to introduce "evidence of a valid first sale." Pla. Reply at 6. According to ZAGG, the "Defendants bear the burden of proving the ZAGG Product they sold was lawfully purchased before they may raise the first sale doctrine as a defense." *Id.* at 25. To do so, ZAGG insists, DVG must trace each product back to ZAGG's *initial* sale of that product. *See id.* at 26 ("[T]he evidence is undisputed that neither Defendants nor anyone else know the chain of custody of the ZAGG Products sold by Defendants. Accordingly, without evidence from which a jury could find an authorized first sale, Defendants first sale affirmative defense fails." (cleaned up)). DVG answers that it doesn't need to identify each step in a product's supply chain to prove a valid first sale and that "putting the burden on downstream sellers to prove the supply chain would lead to absurd results and stall commerce." Def. Response at 19. We agree with DVG.

Despite the frequency with which the Eleventh Circuit (and judges in our District) resolve trademark-infringement claims based on the first-sale doctrine, we haven't found a single case in which the defendant was required to trace the entire chain of custody of a product back to the manufacturer. *See, e.g.*, *Davidoff*, 263 F.3d at 1031; *Nutradose Labs, LLC v. Santamarta*, 2025 WL 337971, at *2 (11th Cir. Jan. 30, 2025); *Brain Pharma*, 858 F. Supp. 2d at 1353; *TracFone Wireless, Inc. v. Pak China Grp. Co.*, 843 F. Supp. 2d 1284, 1297 (S.D. Fla. 2012) (Martinez, J.).[7]

---

[7]     ZAGG's MSJ cites two out-of-circuit cases for the proposition that the "Defendants bear the burden of proving the ZAGG Product they sold was lawfully purchased before they may raise the first sale doctrine as a defense." Pla. MSJ at 25 (first citing *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 459 F. Supp. 3d 1058, 1082 (N.D. Ill. 2020); and then citing *RFA Brands, LLC*, 2014 WL 7780975 at *7). Neither case helps ZAGG here.

In *Maui Jim*, the court held only that "the parties asserting the first sale affirmative defense" had the burden to "show how they obtained ownership of the Maui-Jim-branded sunglasses that they sold." 459 F. Supp 3d at 1082. But *Maui Jim* never held that, to invoke the first-sale doctrine, the defendant had to identify every step in the product's supply chain all the way back to the manufacturer. *Id.* at 1082. In our case, DVG has done far more than the supplier did in *Maui Jim* by disclosing the

What ZAGG's novel chain-of-custody argument is really (we think) driving at is ZAGG's speculation that DVG is selling counterfeit or damaged goods. *See* Pla. MSJ at 15 ("Defendant does not know whether the ZAGG Product it sells is counterfeit, returned product, damaged (flood, fire, etc.), and in fact cannot make any representations whatsoever about the condition of the product."). But the record evidence belies this speculation. *First*, ZAGG concedes that all its test purchases from DVG resulted in the delivery of genuine ZAGG products. *See* Transcript of Discovery Hearing Dated August 8, 2024 [ECF No. 217] at 7:7–9 ("To be very clear, we purchased a handful. They are product that appears to be authentic. They have been non-counterfeit product."). *Second*, DVG has attested (under oath) that all the ZAGG products it buys are "independently sorted and graded in accordance with Amazon's condition guidelines before sending them to Amazon's warehouses" and that "[m]any of the products come in their original case packs from the factory." Declaration of Menachem Mendel Ichilevici ("Ichilevici Decl.") [ECF No. 312] ¶¶ 12, 14. We thus have no basis for inferring that DVG is marketing as "New" products that suffered fire or flood damage.

As we've said, DVG has *also* disclosed the identity of its supplier, who has now sent ZAGG documentary proof of its sales to DVG. *See generally* Order Reversing Magistrate Judge's Spoliation Order. Despite receiving this information—and with discovery now closed—ZAGG hasn't adduced any evidence for its view that DVG is purchasing counterfeit, returned, or otherwise unauthorized inventory from its supplier. So, while DVG may not know *where* its supplier gets its ZAGG inventory, that break in the custodial chain isn't sufficient, standing alone and at summary judgment, to render

---

identity of its supplier and producing documents and testimony about that supplier's sales to DVG. *See generally* Order Reversing Magistrate Judge's Spoliation Order [ECF No. 345].

  *RFA Brands* is similarly unhelpful. The magistrate judge there found that a defendant couldn't prove the existence of a first authorized sale because he sold goods that he claimed to have "found in [two] storage units he acquired." 2014 WL 7780975, at *8. But this wasn't the only reason for the magistrate judge's skepticism about the defendant's first-sale defense: As it turns out, the plaintiff in that case introduced "proof that the products [the defendant sold] were returned product not to be resold." *Ibid.* Our case is very different. DVG isn't selling "mysterious found goods," and ZAGG hasn't shown that the products DVG sells were first returned by consumers. That's enough for now.

the first-sale doctrine inapplicable as a matter of law. We'll therefore permit DVG to assert its first-sale defense at trial.

### ii.      The Material-Difference Exception

ZAGG also relies on the "material difference" exception to the first-sale doctrine. *See* Pla. Reply at 7 ("[M]any of the products have been materially altered, either by having been previously opened, repackaged, restickered, or damaged, and/or because the product does not carry the manufacturer's warranty as it was sold outside the authorized supply chain."); *see also ibid.* ("[A] materially different product is not genuine, and therefore its unauthorized sale constitutes trademark infringement." (quoting *Davidoff*, 263 F.3d at 1302)). As the Eleventh Circuit explained in *Davidoff*:

> [The first-sale] doctrine does not hold true, however, when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner. . . . We follow our sister circuits and hold that the resale of a trademarked product that is materially different can constitute a trademark infringement. This rule is consistent with the purposes behind the Lanham Act, because materially different products that have the same trademark may confuse consumers and erode consumer goodwill toward the mark.

> Not just any difference will cause consumer confusion. A material difference is one that consumers consider relevant to a decision about whether to purchase a product. Because a myriad of considerations may influence consumer preferences, the threshold of materiality must be kept low to include even subtle differences between products.

263 F.3d at 1302 (cleaned up). ZAGG says that the products DVG sells are "materially different" from genuine ZAGG products in two ways. *First*, according to ZAGG, some of those products have been "opened, repackaged, restickered, or damaged." Pla. Reply at 7. *Second*, ZAGG claims that the products are different because DVG's products don't "carry the manufacturer's warranty." *Ibid.* DVG parries that ZAGG hasn't "established (and cannot establish) that there is any difference between the products sold by ZAGG and those sold by DVG" and that the "Plaintiffs have not shown that ZAGG's purported warranty is relevant to a consumer." Def. Response at 18–19. Plus, DVG says, it "meets or exceeds" the terms of ZAGG's warranty because it offers to replace customers' defective items *without* charging them a $10 shipping fee. *Ibid.*

The issue before us, then, is whether the differences, if any, between the ZAGG and DVG products are "relevant to a [consumer's] decision about whether to purchase a product." *Davidoff*, 263 F.3d at 1302. Our judges have repeatedly said that differences in the "condition and appearance of the packaging of a watch"—and its "lack [of] warranty coverage"—*may be* material. *Swatch S.A. v. New City, Inc.*, 454 F. Supp. 2d 1245, 1250–51 (S.D. Fla. 2006) (Huck, J.); *see also TracFone Wireless, Inc.*, 843 F. Supp. 2d at 1297 ("[R]eselling products with inferior warranties also constitutes a material difference." (cleaned up)). Recognizing, however, that "a myriad of considerations may influence consumer preferences," *Davidoff*, 263 F.3d at 1302, our Court has generally treated this issue of materiality as a question "of material fact for a jury to decide," *Swatch*, 454 F. Supp. 2d at 1251.

As we've hinted, the parties in our case dispute the applicability of the material-difference exception. In doing so, they disagree over *both* whether the products' packaging is different (depending on who sells it) *and* whether the DVG and ZAGG warranties are materially distinct. As to packaging, ZAGG says that DVG sells ZAGG products with damaged packaging—a contention DVG denies. *Compare* PSMF ¶ 51 ("As an employee of ZAGG, Mr. Longmore submitted certain reports for 'Mac N' Cheese's' sale of ZAGG products that were advertised in 'New' condition but were delivered in damaged or used condition."), *with* PSMF Response ¶ 51 ("Disputed that any products were damaged or used[.]"). DVG has also introduced expert testimony for its position that any damage to the products' packaging likely occurred in transit. *See* Greer Report at 12 ("[I]t is [ ] reasonable to assume that any packaging damage to the test buy product occurred during transit to ZAGG."). Whether DVG is selling products with damaged or used packaging—and the extent to which any such damage occurred in transit—are thus very much disputed factual questions we'll allow a jury to resolve.

We'll do the same with the parties' disputes over the products' warranty coverage. Here, DVG insists that its return policy *exceeds* the terms of ZAGG's warranty, such that the lack of warranty coverage *can't* be a material difference between ZAGG and DVG products. *See* Def. Response at 19

17

("DVG has presented evidence that it meets or exceeds the manufacturer's warranty[.]" (cleaned up)). Again, ZAGG disputes this proposition. *See* Pla. Reply at 9 ("The Amazon definition of 'New' is very clear, and requires that the product be genuine, in its original packaging, in brand-new condition, and carry the *manufacturer's* warranty." (emphasis added)). We'll let the jury hear (and resolve) both sides' arguments on this issue, too.

We therefore **DENY** ZAGG's request for summary judgment on its trademark-infringement claims. Since DVG's request for summary judgment on these claims relies *exclusively* on the first-sale doctrine, *see* Def. MSJ at 21 ("At the end of the day, ZAGG is attempting to exclude resellers from selling the same products that ZAGG introduces into the marketplace, through dubious trademark allegations. Summary judgement is therefore warranted on Counts I and II." (emphasis removed))— and because we've identified a genuine dispute of material fact as to the application of that doctrine— we'll also **DENY** DVG's request for summary judgment on ZAGG's trademark-infringement claims. Finally, because we've denied DVG's request for summary judgment on ZAGG's trademark-infringement claims, we likewise **DENY** DVG's request for summary judgment on its declaratory-judgment counterclaim. *See* Def. MSJ at 32 ("ZAGG has not shown (and cannot show) that the ZAGG Products sold by DVG infringe any valid trademark owned by ZAGG. For at least this reason, summary judgement is therefore warranted in favor of DVG on its Counterclaim I.").

### c.  Screenya's FDUTPA Counterclaim

ZAGG next argues that, "[b]ecause Screenya has established entitlement to summary judgment as to its unfair competition and false advertising claim, it is similarly entitled to summary judgment against DVG under FDUTPA, given that the two claims are evaluated under the same framework." Pla. MSJ at 26 (citing *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008)). ZAGG is right that its FDUTPA claim rises and falls with its trademark-infringement and false-advertising claims under the Lanham Act. *See Suntree Techs., Inc. v. Ecosense Int'l,*

*Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) ("The legal standards we apply to the FDUPTA claim are the same as those we have applied under section 43(a) of the Lanham Act. Plaintiff's failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law." (quotations omitted & cleaned up)). But because ZAGG hasn't shown that it's entitled to summary judgment on its Lanham Act claims, we **DENY** its request for summary judgment on its FDUTPA claim.

Having thus denied ZAGG's request for summary judgment on its claims, we must now determine whether it's entitled to summary judgment on any of DVG's counterclaims. *See* Pla. MSJ at 30 ("There exists no genuine issue of material fact that could allow any one of DVG's claims against any of the ZAGG Parties to continue.").

### d. DVG's Defamation Counterclaim

In its Counterclaims, DVG alleges that ZAGG defamed DVG by submitting four "false" reports to Amazon about DVG's products. *See* DVG's Counterclaims ¶¶ 56–94. ZAGG believes that it's entitled to summary judgment on DVG's defamation counterclaim because "there is no evidence of any defamatory statement being made." Pla. MSJ at 30; *see also id.* at 31 ("DVG has failed to put forth any substantive evidence supporting its conclusory allegations that Longmore's 'four reports' to Amazon on behalf of ZAGG were false, were made negligently, caused DVG actual damage, or were defamatory."). DVG insists that the four reports ZAGG submitted to Amazon were both false and made negligently. *See* Def. Response at 30 ("[A]s discussed in DVG's Motion, the ZAGG Reports were [ ] literally false[.]"); *see also id.* at 31 ("The evidence establishes that, at a minimum, ZAGG and Longmore were negligent in submission of their reports to Amazon concerning DVG.").

Under Florida law, defamation is "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973). "True statements, statements that are not readily capable of being proven false, and

statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). The "substantial truth doctrine" also applies in Florida, meaning that "a statement does not have to be perfectly accurate" to avoid being defamatory "if the 'gist' or the 'sting' of the statement is true." *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1234 (Fla. 3d DCA 2021). Under Florida law, then, "[d]efamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

DVG has alleged that ZAGG's statements were defamatory *per se*. *See* Def. Response at 32 ("ZAGG and Longmore's Statements Were Defamatory *Per Se*[.]"). A defamation *per se* claim "does not require any additional explanation in order to prove the [fifth element], [the] defamatory nature of the statement." *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259 (S.D. Fla. Aug. 30, 2021) (Bloom, J.). A statement is defamatory *per se* "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Block v. Matesic*, 789 F. Supp. 3d 1131, 1155 (S.D. Fla. 2025) (Altman, J.).

After carefully reviewing the statements ZAGG submitted to Amazon, we agree with ZAGG that DVG hasn't established that the statements were *either* false *or* made negligently. ZAGG has submitted a sworn declaration detailing each of the four challenged reports:

- Report 1: "[O]n April 27, 2022, I submitted a trademark infringement report to Amazon, Brand Registry ID 9980620221, which stated: 'We purchased the product. The product has been altered and may cause consumer confusion.'"
- Report 2: "[O]n May 11, 2022, I submitted a trademark infringement report to Amazon, Brand Registry ID 10050893801, which stated: 'We purchased the

product. The product received is the wrong product and may cause consumer confusion.'"

- <u>Report 3</u>: "[O]n December 23, 2022, I submitted a trademark infringement report to Amazon, Brand Registry ID 11575117091, which stated: 'We purchased the product. The product received is the wrong product and may cause consumer confusion.'"

- <u>Report 4</u>: "[O]n January 5, 2023, I submitted a trademark infringement report to Amazon, Brand Registry ID 116678519851, which stated: 'We purchased the product. The product received is the wrong product and may cause consumer confusion.'"

Longmore Decl. ¶¶ 21, 25, 29, 33. Because DVG hasn't shown that these reports were false or negligent, we'll limit our analysis to those two elements of defamation.

### 1. Falsity

ZAGG says that "the factual record developed through discovery confirms [that] [ ]: the infringement notices were literally true." Pla. MSJ at 31; *see also id.* at 32 ("The reports that the products received were 'the wrong product' or had been 'altered' (in the case of the opened product received) were objectively and literally true."). In ZAGG's view, the statements in the reports were true because ZAGG's test purchases yielded products that *either* had been "opened, with the packaging seal removed," (Report 1) *or* "had a SKU/model number different than advertised" (Reports 2–4). *Id.* at 18. DVG contends that Report 1 was "literally false" because "Longmore conceded that the product [had] not been 'altered.'" Def. Response at 30. And it says that Reports 2–4 were false because the products ZAGG received weren't "different" from the ones ZAGG had ordered. *See* Def. Response at 31 (arguing that, since "ZAGG uses a variety of 'SKU equivalents' for its products," the same product "may be assigned multiple SKUs and UPCs").

On Report 1, we agree with ZAGG. There's simply no evidence that ZAGG's statement—describing the product it received as "altered"—was false. In its MSJ, ZAGG attaches a photograph of the product and explains that it considered the product "altered" because it was "opened, with the packaging seal removed." Pla. MSJ at 18. DVG doesn't address this evidence at all. *See generally* Def.

Response at 30–31.[8] Instead of directing us to any evidence of falsity, DVG asks us to find Report 1 "literally false" because, "[w]hen questioned under oath, Longmore conceded that the product had not been 'altered.'" Def. Response at 30 (citing DSMF ¶ 54). But, as ZAGG observes in its Reply, this is a gross mischaracterization of Longmore's testimony. *See* Pla. Reply at 7 ("Because DVG cannot dispute the truth of these statements, it resorts to blatantly misconstruing Longmore's testimony, inserting brackets to entirely change the meaning of what was said on the record."). What Longmore *actually* said was that he considered the product discussed in Report 1 to have been "altered" because "[he could] no longer read the serial number [which] would make it so [he] would not be able to track and trace the product in our serial system." Deposition of Merril Longmore ("Longmore Tr.") [ECF No. 313-2] at 141:3–8. This isn't a concession that the product hadn't been altered—it's the opposite: Indeed, when Longmore was shown the relevant image, he *immediately* identified an alteration. *See ibid.* And the mere fact that ZAGG *may* also "cover[ ] the serial numbers on its products," Def. Response at 31, doesn't make the statement that the product was "altered" any less true because DVG may cover the serial number in a different way than ZAGG would, resulting in a product that's been "altered." Plus, Longmore was clear that, "as far as [he] [is] aware, on a retail level of product with boxes, no [ZAGG *doesn't* cover the serial number with a sticker]." Longmore Tr. 141:12–15.

As to Reports 2–4, DVG says that ZAGG hasn't "presented any evidence as to why the purported differences in SKUs make the product different." *Ibid.* In saying so, though, DVG impermissibly shifts the burden onto ZAGG. But the law is clear that *DVG* bears the burden of proving the falsity of ZAGG's statements—not the other way around. *See Johnston v. Borders*, 36 F.4th

---

[8] In other sections of its Response, DVG contends that any damage to the products ZAGG received from its test purchases likely occurred during transit. *See* Def. Response at 24 ("[A]ny light damage to the packaging likely occurred during Amazon's shipping of the product[.]" (citing Greer Report at 11)). But, even assuming that the product was opened and "the packaging seal [was] removed" in transit, that doesn't make ZAGG's statements that the product was "altered" false. It would only mean that the alteration was caused by a party *other* than DVG. Pla. MSJ at 18.

1254, 1275 (11th Cir. 2022) (holding that the "plaintiff must establish" the elements of a defamation claim). And DVG doesn't even try to hide the fact that it's produced *no evidence* for its claim that anything in Reports 2–4 was false. So, even at summary judgment—where we must "review the facts and all reasonable inferences in the light most favorable to the non-moving party," *Pennington*, 261 F.3d at 1265—we find with little difficulty that ZAGG's statements to Amazon weren't false.

ZAGG has submitted sworn testimony that it purchased from DVG certain products with specific SKU numbers and received products with *completely different* SKU numbers—testimony which DVG hasn't rebutted. *See* Pla. MSJ at 32 ("In each instance, the product at issue was found to be [ ] the incorrect product, with a different product model/SKU number than advertised[.]"); *see also* Longmore Decl. ¶¶ 25, 29, 33 (explaining that ZAGG's test purchases resulted in the receipt of products with different SKUs than ordered). And the record shows that ZAGG products with different SKUs have "external differences of the packaging of these products[.]" Longmore Tr. 135:1–7; *see also id.* 66:22–24 ("Q Does ZAGG have -- does ZAGG provide Best Buy with any unique product offerings? A Yes. They have their own SKUs and UPCs."). While the differences between these products may be minimal, that doesn't render *false* Longmore's description of products with completely different SKUs as "different."

Since DVG "has failed to make a sufficient showing on an essential element" of its defamation counterclaim, *Celotex*, 477 U.S. at 323, we could end our analysis here. But there's a second (and independent) basis for granting ZAGG's request for summary judgment on DVG's defamation counterclaim: DVG hasn't shown that ZAGG made its statements "at least negligently." *Turner*, 879 F.3d at 1262.

### 2. Negligence

To succeed on its defamation counterclaim, DVG must show that ZAGG acted "at least negligently" in submitting its reports to Amazon. *Turner*, 879 F.3d at 1262. ZAGG says the reports

*weren't* made negligently because they "were sent to Amazon only after ordering and receiving a product that confirmed the statements made in the report." Pla. MSJ at 32. In response, DVG claims that "Longmore conceded that **he did not verify the truth** of any of the statements made to Amazon regarding DVG prior to submission." Def. Response at 31 (emphasis in original) (citing Longmore Tr. 137:1–4). Again, however, Longmore conceded no such thing. Purporting to quote directly from Longmore's deposition transcript, DVG writes as follows: "Q Did you investigate [the claim] prior to submitting any of the reports that you submitted against Mac N' Cheese? A No." *Ibid.* (citing Longmore Tr. 137:1–4). But DVG's insertion of the bracketed text fundamentally changes the question Longmore was answering. In fact, Longmore was asked *two* questions: "Are you aware of situations where ZAGG has printed a new UPC and replaced over the original UPC?" and "Did you investigate that prior to submitting any of the reports that you submitted against Mac N' Cheese?" To both questions, he answered: "No." Longmore Tr. 136:20–137:4. Longmore thus *didn't* testify (or even imply) that he hadn't investigated "any of the statements made to Amazon." Def. Response at 31. Since DVG hasn't adduced any other evidence of negligence—and because DVG hasn't addressed ZAGG's claim that Longmore made the four reports only after confirming the results of the test purchases, *see* Pla. MSJ at 32—we have little trouble granting ZAGG's request for summary judgment on DVG's defamation counterclaim.

ZAGG's request for summary judgment on DVG's defamation counterclaim is therefore **GRANTED**, and DVG's (frivolous) request for summary judgment on this same counterclaim is **DENIED as moot**. *See* Def. MSJ at 33 ("Summary Judgment Should Be Granted on DVG's Defamation Claim.").

### e.   DVG's Conspiracy Counterclaim

DVG's next counterclaim alleges that ZAGG, Screenya, Buckner, and Longmore engaged in a civil conspiracy to "offer[ ] ZAGG Products on Amazon listings for ZAGG Products at prices

materially different (whether higher or lower) than those offered by Amazon and other third-party sellers for purposes of fraudulently manipulating Amazon's pricing algorithms." DVG Counterclaims ¶ 204. ZAGG attacks this counterclaim under the intra-corporate-conspiracy doctrine, which stands for the commonsense proposition that "a single legal entity comprised of ZAGG, Screenya, and two ZAGG employees cannot conspire with each other as a matter of law." Pla. MSJ at 25. Again, we agree with ZAGG.

"The elements of civil conspiracy in Florida are: (1) an agreement between two or more parties (2) to do an unlawful act; (3) doing an overt act to further the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy." *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1312 (S.D. Fla. 2017) (Altonaga, J.). DVG's civil-conspiracy counterclaim fails the first element of this test because it has failed to establish an agreement between two or more parties.

"[U]nder the intracorporate conspiracy doctrine, [a company] cannot conspire with its employees, owners, and affiliates." *Apex Toxicology, LLC v. United HealthCare Servs., Inc.*, 2020 WL 13551299, at *7 (S.D. Fla. July 7, 2020) (Smith, J.); *see also AstroTel, Inc. v. Verizon Fla., LLC*, 2012 WL 1581596, at *9–10 (M.D. Fla. May 4, 2012) (Covington, J.) ("Pursuant to the intracorporate conspiracy doctrine, alleged agreements between an employee and the company the employee works for cannot form the basis for a civil conspiracy claim. . . . This doctrine also applies to a parent-subsidiary relationship[.]" (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 770–71 (1984))). As the Eleventh Circuit has explained:

> The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves. The doctrine is based on the nature of a conspiracy and the legal conception of a corporation. It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan. However, under basic agency principles, the

> acts of a corporation's agents are considered to be those of a single legal actor. Therefore, just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself.

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

The parties DVG accuses of engaging in a civil conspiracy are all protected by the intra-corporate-conspiracy doctrine. It's undisputed that Buckner and Longmore were ZAGG employees. *See* DSMF ¶¶ 26–27 ("Merril Longmore is ZAGG's Director of Ecommerce. . . . Brendon Buckner is ZAGG's former Tax Director."); *see also* DSMF Response ¶¶ 26–27 ("Undisputed" as to each paragraph). It's also undisputed that Screenya is wholly-owned (and controlled) by ZAGG. *See* DSMF ¶ 59 ("In March 2022, ZAGG set up Screenya as a Delaware LLC, with ZAGG being the sole member."); *see also* DSMF Response ¶ 59 ("Undisputed"); Def. Response at 33 ("[I]t is true that ZAGG and Screenya are one and the same[.]"). Given the relationship between these parties, the intra-corporate-conspiracy doctrine bars DVG's civil-conspiracy counterclaim as a matter of law.

Still resisting, DVG offers two counterarguments—both unconvincing. *First*, DVG says that "Buckner continued to participate in the scheme even after he left his employment with ZAGG[.]" *Ibid.* (citing DSMF ¶ 65). But (again) DVG distorts Buckner's testimony, in which he explained that (as ZAGG's former tax director) he was inadvertently mailed a "couple" of informational "tax documents" related to Screenya, even after he'd left ZAGG's employment. Deposition of Brendan Buckner ("Buckner Tr.") [ECF No. 313-1] at 44:8–24. DVG hasn't provided *any* evidence that the government's mistaken decision to mail these unrelated documents to Buckner indicates that he was somehow involved in a continuing civil conspiracy with ZAGG, so we have no difficulty disregarding this argument. *Second*, DVG says that, because the "Plaintiffs clearly acted outside of the scope of a legitimate business in their scheme to manipulate Amazon's pricing algorithms through a 'shill bidding' scheme," "the 'intracorporate conspiracy doctrine' does not apply." Def. Response at 33–34 (citing *Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*, 2022 WL 913252, at *4 (S.D. Fla. Jan. 10,

26

2022) (Goodman, Mag. J.), *report and recommendation adopted*, 2022 WL 910633 (S.D. Fla. Mar. 29, 2022) (Scola, J.)). But the one case DVG cites (*Bluegreen*) doesn't stand for this proposition at all. In fact, *Bluegreen* doesn't even discuss the intra-corporate-conspiracy doctrine. *See generally ibid.* (striking the affirmative defenses of corporate officers in a civil-conspiracy case).[9] Because DVG hasn't identified a relevant exception to the intra-corporate-conspiracy doctrine, we **GRANT** ZAGG's request for summary judgment on DVG's civil-conspiracy counterclaim and **DENY as moot** DVG's request for summary judgment on that same claim.

### f.   DVG's FDUTPA Counterclaim

DVG's last counterclaim alleges that ZAGG violated FDUTPA by "fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2022 and continuing through the date of this filing." DVG Counterclaims ¶ 221. ZAGG asks us for summary judgment on this counterclaim because "there is simply no evidence of any wrongdoing or unfair and deceptive acts by the ZAGG Parties." Pla. MSJ at 33 (emphasis removed). DVG, in response, maintains that ZAGG uses Screenya "to manipulate Amazon's pricing algorithms [in] a violation of countless laws and regulations." Def. Response at 35.

"To prevail on a FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018) (Moore, C.J.) (citing *Hucke v. Kubra Data Transfer, Corp.*, 160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015) (Rosenberg, J.)). "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Ibid.* (citing *Hucke*, 160 F. Supp. 3d at 1328).

---

[9] For what it's worth, DVG *also* hasn't introduced *any* evidence for its claim that ZAGG engaged in a "shill bidding scheme." *See generally* Def. Response; Def MSJ.

We allowed DVG's FDUTPA counterclaim to survive ZAGG's motion to dismiss because DVG accused ZAGG of "'excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level' in a way that 'substantially affected Florida's trade and commerce'—including through 'lost sales' for DVG, whose principal place of business is in Florida." *ZAGG*, 2024 WL 3874584, at *12 (quoting DVG Counterclaims ¶¶ 221–24). This accusation was sufficient to survive a motion to dismiss, but summary judgment requires evidence—and DVG has none.

DVG's Response and MSJ are replete with conclusory accusations of illegal conduct, but the gravamen of its FDUTPA counterclaim is that ZAGG uses Screenya to sell products "at prices materially different (whether higher or lower) than those offered by Amazon and other third-party sellers" in an effort to "manipulate[ ] Amazon's pricing algorithms." Def. Response at 34; *see also* Def. MSJ at 36 ("ZAGG has unfairly competed with DVG and intentionally deceived Amazon and consumers by creating a 'shell' company, Screenya, through which ZAGG fraudulently offered, and continues to offer, ZAGG Products on Amazon listings for ZAGG Products at prices materially different (whether higher or lower) than those offered by Amazon and other third-party sellers for purposes of fraudulently manipulating Amazon's pricing algorithms."). But DVG hasn't introduced even a *scintilla* of evidence that ZAGG engages in price manipulation in this way or that it otherwise deceives consumers.

To support its conclusory price-manipulation allegations, DVG relies only on paragraphs 55–91 of its DSMF. *See* Def. Response at 34 ("Zagg has unfairly competed with DVG and intentionally deceived Amazon and consumers by creating a 'shell' company, Screenya, through which Zagg fraudulently offered, and continues to offer, Zagg Products on Amazon listings. (DSOF ¶¶ 55–91.)"). But these paragraphs don't support this claim at all. Instead, the DSMF merely argues that ZAGG uses Screenya to skirt Amazon's policies regarding first-party and third-party sellers. *See, e.g.* DSMF ¶

60 ("Aware that Screenya could not share ZAGG's address (because Amazon would notice and realize that ZAGG was violating its policies), ZAGG's (then) Chief Legal Counsel, Abby Barraclough, approached ZAGG's (then) Tax Director, Brendon Buckner, regarding alternative options."); *id.* ¶ 80 ("ZAGG has never informed Amazon that it owns Screenya, whose only function is to sell ZAGG Products in contravention of Amazon's policies.").

Price manipulation is only discussed once in DVG's cited portion of its DSMF: "ZAGG," DVG writes there, "seeks to use the Screenya Storefront to drive up Amazon prices." DSMF ¶ 91 (first citing DSMF Exh. 20 ("Product Listing One") [ECF No. 313-13]; and then citing DSMF Exh. 21 ("Product Listing Two") [ECF No. 313-14]). But ZAGG specifically marked this contention as "Disputed" and noted that "[t]here is no evidence offered whatsoever of ZAGG 'driving up' prices." DSMF Response ¶ 91. ZAGG's right.

Product Listings One and Two are merely screenshots of Amazon listings for two ZAGG screen protectors. DVG provides no analysis of the prices shown on those screenshots, doesn't describe how these listings evince any form of manipulation, and never ties this "evidence" back to its claim in any way. And that's probably because these screenshots seem to belie any contention that Screenya's sale of ZAGG products affects Amazon's pricing algorithm to the detriment of consumers. Product Listing One shows a screen protector "sold by Amazon.com" for $33.99. *See* Product Listing One at 2. The next page shows listings from "Other Sellers on Amazon," including Mac N' Cheese (DVG), which has listed the product for $33.99 (*the same price* charged by Amazon.com), and Screenya, which has listed the product for $44.99. *Id.* at 3. So, what DVG has *actually* shown is that Screenya can charge a *higher* price for a ZAGG product *without* affecting the price Amazon or other third-party sellers charge.[10]

---

[10] While DVG only directs us to listings in which Screenya charges *higher* prices than its competitors, we aren't sure how Screenya's decision to charge *lower* prices would harm consumers at all. *See* Def. Response at 34 ("ZAGG fraudulently offered, and continues to offer, ZAGG Products on Amazon

Besides these screenshots—which, again, don't support DVG's counterclaim—DVG hasn't provided *any* evidence that ZAGG manipulates prices on Amazon or otherwise deceives, misleads, or harms consumers. Instead, DVG shamelessly and repeatedly distorts Buckner's testimony to fit its conspiratorial narrative. For instance, it alleges that, in forming Screenya, certain ZAGG employees "agreed" to use "falsified" information—something *no one* (least of all Buckner) ever said. *Compare* DSMF ¶ 62 ("Given ZAGG's desire to conceal Screenya's true ownership, it was agreed that Buckner would request the EIN using falsified information, and that ZAGG would list Buckner's home address as the address of Screenya." (citing Buckner Tr. 32:3–13; 33:14–17)), *with* Buckner Tr. 32:3–13; 33:14– 17 ("Q Okay. Do you know what Screenya's address is? A Yes. It's [home address]. Q I'm sorry. Can you repeat that whole address? A Yes. Q So I'm sorry. Can you just repeat that? What is Screenya's address? A [Home address]. Q And that is your home address? A Correct."). DVG's *real* complaint, in short, is that ZAGG is deceiving Amazon, not consumers. But we agree with ZAGG that "the only proper plaintiff (if any) for an alleged violation of Amazon's policies would be Amazon on a breach of contract theory." Pla. MSJ at 37 (emphasis removed).

Because DVG hasn't adduced *any* evidence to support its FDUTPA counterclaim, "no reasonable jury could return a verdict" in its favor. *Lima*, 627 F. App'x at 75. We therefore **GRANT** ZAGG's request for summary judgment on DVG's FDUTPA counterclaim and **DENY as moot** DVG's parallel request for judgment on that claim.[11]

---

listings for ZAGG Products at prices materially different (whether *higher or lower*) than those offered by Amazon and other third-party sellers." (emphasis added)). And DVG doesn't bother to explain this argument in its Response or MSJ. *See generally* Def. Response; Def. MSJ. We'll thus say nothing else about it. *See Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152 (11th Cir. 2011) ("It is well settled that issues not raised in the district court in the first instance are forfeited.").

[11] One more thing. Buckner and Longmore were only brought into this case because DVG's counterclaims accused them of misconduct. *See generally* DVG Counterclaims. But now that we've granted ZAGG summary judgment on the counterclaims DVG has asserted against Buckner and Longmore, we needn't address ZAGG's separate argument that we lack personal jurisdiction over those two individuals. *See* Pla. MSJ at 26 ("Summary judgment in favor of Longmore and Buckner on

## II.      DVG's Motion for Summary Judgment

Our adjudication of ZAGG's MSJ has significantly narrowed the issues we must now address in resolving DVG's MSJ. After all, we've already denied DVG's request for summary judgment as to: (1) ZAGG's trademark-infringement claims; (2) DVG's declaratory-judgment counterclaim; (3) DVG's defamation counterclaim; (4) DVG's conspiracy counterclaim; and (5) DVG's FDUTPA counterclaim. All that remains, therefore, are DVG's requests for summary judgment on: (1) ZAGG's false-advertising claims; (2) Screenya's FDUTPA counterclaim; and (3) ZAGG's alter-ego-liability claim. We'll address each of these arguments below.

### a.  ZAGG and Screenya's False-Advertising Claims

As we've discussed, ZAGG alleges that DVG falsely advertises its ZAGG products as "New," even though they don't carry the original manufacturer's warranty and are purchased from a liquidation wholesaler. *See supra* § I.a. DVG asks for summary judgment on ZAGG's false-advertising claims for four reasons. *First*, DVG claims that ZAGG's SAC "does not include a claim for false advertising" and argues that ZAGG "should not be permitted to introduce a new legal claim in briefing that is not included in its SAC." Def. MSJ at 21. We can dispose of this first argument summarily because we've already found that ZAGG sufficiently pled a false-advertising claim, *see supra* § I.a n.2, so we now **DENY** this part of DVG's MSJ. *Second*, DVG contends that the "Plaintiffs have not [ ] demonstrate[d] the first element of the claim—a false or misleading advertisement[.]" Def. MSJ at 22. Again, however, we've already identified a genuine dispute of material fact as to the alleged falsity of DVG's "New" designation, *see supra* § I.a, so we likewise **DENY** this part of DVG's MSJ. *Third*, DVG says that ZAGG has failed to produce any evidence of "consumer deception," and that ZAGG has failed to show that DVG's "New" designation is material to the "purchasing decisions of consumers." Def.

---

DVG's Counterclaims is proper as personal jurisdiction over Longmore and Buckner simply does not exist within this District[.]"). We therefore **DENY as moot** this part of ZAGG's MSJ.

MSJ at 27. *Fourth*, according to DVG, ZAGG hasn't established that DVG's alleged false advertising "caused injury" to ZAGG. *Id.* at 22. We'll address these last two arguments here.

As we explained in § I.a *supra*, to succeed on a false-advertising claim under the Lanham Act, a plaintiff must prove five elements: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Compulife Software Inc.*, 959 F.3d at 1316.[12] In its remaining arguments, DVG attacks the third and fifth elements of this test (materiality and injury), so those are the two elements we'll address in the following pages.

### 1. Materiality

As we've described, to prevail on a false-advertising claim, a plaintiff must show that the deception "had a material effect" on consumers' purchasing decisions. *Ibid.* To prove that a deception was "material," a plaintiff may show that "the defendants misrepresented an inherent quality or characteristic of the product." *Swatch S.A.*, 454 F. Supp. 2d at 1253 (cleaned up). DVG says that the alleged differences between the parties' products—*e.g.*, the lack of ZAGG's warranty or the fact that DVG purchases its products from a liquidation wholesaler—aren't material to consumers. *See* Def. MSJ at 27 ("[C]ommon sense would suggest that consumers do not care if the manufacturer's warranty applies to a piece of plastic that costs approximately $20–30[.]"); *see also id.* at 28 ("It is hard to imagine why a consumer would care about the particular distribution method that led to him or her being able to purchase a ZAGG Product on Amazon."). ZAGG, for its part, insists that both alleged differences

---

[12] DVG argues that ZAGG hasn't satisfied the *second* element of its false-advertising claims because it hasn't introduced "evidence of consumer deception[.]" Def. MSJ at 28. But ZAGG alleges that DVG's "classification of [its] products as 'New' is literally false." Pla. Response at 15. And, if it ultimately succeeds with that argument, it needn't prove consumer deception. *See Johnson & Johnson*, 299 F.3d at 1247 ("Once a court deems an advertisement to be literally false, the movant need not present evidence of [the second element] consumer deception."). So, we won't grant DVG's request for summary judgment on that element of ZAGG's false-advertising claim.

*are* material because they go to an "inherent quality or characteristic of the product." Pla. Response at 17 (citing *River Light V, L.P. v. Tanaka*, 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018) (Scola, J.)). ZAGG also notes that, if the differences *weren't* material, then the "Defendants would not insist on listing their products as 'New' in the first place." *Ibid.*

We won't dwell on these arguments because we've already agreed to let a jury resolve the parties' disputes about the materiality of these differences. *See, e.g., supra* § I.b.1.ii. We add here only that DVG's reliance on "common sense" in this section gives the game away. We're not the arbiters of "common sense" when it comes to consumer preferences—everyday consumers are—so we'll leave these questions to the everyday consumers on our jury. *See Swatch S.A.*, 454 F. Supp. 2d at 1253 ("Whether a warranty is an inherent quality or characteristic of a Swatch watch is a question of material fact precluding an entry of summary judgment.").

We therefore **DENY** this part of DVG's MSJ.

### 2.  Injury

Next, DVG argues that ZAGG hasn't shown it's been injured by DVG's alleged false advertising. *See* Def. MSJ at 29 ("ZAGG has provided no evidence regarding its market share at all, let alone any loss of market share. . . . Nor has ZAGG presented any evidence of harm to its goodwill or reputation."). ZAGG responds that it's suffered "the paradigmatic injury of a false advertising claim" because consumers have been induced to purchase products from DVG (rather than ZAGG) "based on false statements made by [DVG] about their goods[.]" Pla. Response at 18 (citing *U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, 524 F. Supp. 3d 1320, 1336 (S.D. Fla. 2021) (Altman, J.)).[13]

---

[13] ZAGG also contends that it has lost, and will continue to lose, "the hard-earned goodwill they have won from consumers as trusted mobile device protection purveyors each time Defendants ship out a damaged, used, or inauthentic ZAGG Product, and when those customers seek out a warranty from ZAGG, only to find their product is not covered." *Ibid.* (citing *Otter Prods.*, 2019 WL 1403022, at *1). We won't reach this argument for two reasons. *First*, ZAGG's "paradigmatic" injury is sufficient for ZAGG's false-advertising claims to survive DVG's MSJ. *Second*, as we've discussed, we think a jury is

In its Reply, DVG maintains that ZAGG lacks evidence of this alleged harm. *See* Def. Reply at 11 ("Plaintiffs do not allege (nor can they) that Screenya and DVG compete in a two-player market where a sale to DVG means a lost sale for Screenya." (emphasis removed)). Here, again, we agree with ZAGG.

The "diversion of sales to a direct competitor [is] the paradigmatic direct injury from false advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014); *see also U.S. Structural Plywood*, 524 F. Supp. at 1336 (explaining that "the paradigmatic false-advertising claim" is one "in which one competitor directly injures another by making false statements about his own goods or the competitors' goods and thus inducing customers to switch." (citing *Lexmark*, 572 U.S. at 137)). There's no question that ZAGG and DVG are direct competitors and that they sell the exact same products. *See* Def. MSJ at 12 ("For some time, DVG (and Mr. Ichilevici) had resold ZAGG Products on Amazon without issue or interference from ZAGG."); *see also* Product Listing One (showing that Screenya and Mac N' Cheese sell identical products and compete for customers on Amazon's marketplace). And, when we look at the evidence in the light most favorable to the non-movant (here, ZAGG), we think it reasonable to infer that a customer shopping for a "New" ZAGG product might purchase one from DVG instead of ZAGG, even without evidence of ZAGG's "market share." *See* DSMF ¶ 7 ("The majority of the products sold by DVG on Amazon are listed as 'New'"); *see also* Pla. MSJ ("Consumers searching for 'New' ZAGG Products on Amazon are deceived into purchasing Defendants' falsely advertised liquidated ZAGG Products rather than truly 'New' products offered for sale and sold by ZAGG and Screenya."). At this stage of the case, then, we're satisfied that ZAGG can show that it's been injured by DVG's conduct.

***

---

best positioned to determine whether the alleged differences (if any) between ZAGG's and DVG's products are material enough to reduce a reasonable consumer's estimation of ZAGG's brand.

We, in short, **DENY** request for summary judgment on ZAGG's false-advertising claims.

### b.  Screenya's FDUTPA Counterclaim

As DVG correctly explains: "Where, as here, a FDUPTA claim is based on the same underlying activity as a Lanham Act claim, it 'rises or falls on the success of its false advertising claim.'" Def. MSJ at 32 (quoting *Nat. Answers*, 529 F.3d at 1333). Because DVG's hasn't shown that it's entitled to summary judgment on ZAGG's false-advertising claims, we **DENY** its motion for summary judgment on Screenya's FDUTPA counterclaim.

### c.  Alter-Ego Liability

Finally, DVG asks us to enter summary judgment on all of ZAGG's claims against TX Trading because "Menachem Ichilevici and DVG are not involved in TX Trading's business, nor does TX Trading have any involvement in their businesses." Def. MSJ at 30. According to DVG, TX Trading was only included in this lawsuit "in a misguided effort to force Mr. Ichilevici to give in to ZAGG's demands by dragging his father's business, TX Trading, into this matter." *Ibid*. In support of this contention, DVG tells us that "TX Trading: (a) is not associated with the Amazon Storefront 'Mac N' Cheese'; (b) does not assist in the operation of, or do business through, this Amazon Storefront; (c) has never done business on Amazon; (d) has never purchased, sold, offered to sell, advertised, or supplied others with ZAGG Products; (e) has not supplied ZAGG Products, or any other products, to the other defendants in this matter." *Id.* at 31 (citing Declaration of Beny Ichilevici ("TX Trading Decl.") [ECF No. 68] ¶¶ 6–11). We agree.

As the moving party, DVG bears the burden of "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. DVG has met this burden by directing us to the TX Trading Declaration, in which Beny Ichilevici, the "President and sole owner of TX Trading Inc[.]," attests that TX Trading has absolutely no relationship with DVG. TX Trading Decl. ¶ 2. Specifically, in that declaration, Ichilevici says that "TX

Trading is not associated with the Amazon Storefront 'Mac N' Cheese,'" "has never done business on Amazon at all," "has never purchased, sold, offered to sell, advertised, or supplied others with ZAGG products," "has not supplied ZAGG products, or any other products, to the other defendants in this matter," and swears that "Menachem Ichilevici and DVG are not involved in TX Trading's business, nor does TX Trading have any involvement in their businesses." *Id.* ¶¶ 6–11.

Since DVG has satisfied its initial burden, the burden then shifts to ZAGG to "come forward with specific facts showing there is a genuine issue for trial." *Bailey*, 284 F.3d at 1243 (emphasis omitted). But ZAGG has failed to do that. Its only evidence that TX Trading is in any way related to DVG is the mere fact that the two businesses share a common address. *See* Pla. Response at 21 ("TX Trading testified that this storefront operates exclusively out of its address: 20355 NE 34th Court, Unit 427, Aventura, FL 33180. That address is not only listed on the Amazon storefront to this day, but is also the registered address of TX Trading, Mac N' Cheese LLC, and the residence of both M.M. and Beny Ichilevici." (cleaned up)). But a shared address isn't sufficient to prove that two businesses are related to each other—much less that they're "alter egos" of one another, as ZAGG claims. *See Eran Fin. Servs., LLC v. Eran Indus. Ltd.*, 2022 WL 18705508, at *6 (S.D. Fla. Nov. 4, 2022) (Reinhart, Mag. J.) ("[I]t is well settled that 'the sharing of a business address and overlap of officers' is insufficient to support a finding that a company is merely an alter ego of an affiliated entity." (quoting *Gubanova v. Miami Beach Owner, LLC*, 2013 WL 6229142, at *4 (S.D. Fla. Dec. 2, 2013) (Rosenbaum, J.)); *see also Lutz v. LexJax, Inc.*, 2022 WL 2703421, at *3 (M.D. Fla. July 12, 2022) (Corrigan, J.) ("Although Fields Auto and Fields Motorcars have similar names and apparently share some commonalities, such as mailing addresses, the Court cannot assume that they are the same entity.").

ZAGG's other "evidence" that the entities are related is even weaker. *First*, ZAGG asks us to infer that TX Trading and DVG are related because "TX Trading testified that M.M. Ichilevici only began residing at [the aforementioned business address] in 2017, and since the storefront began

36

operations in 2016, a reasonable jury could conclude that TX Trading alone ran the business from 2016 to 2017." Pla. Response at 21. But this makes no sense. ZAGG's lawyers presumably don't reside at their business address, so we aren't sure why they'd think that a business can only be operated from a business owner's home. And we won't infer that Beny Ichilevici perjured himself when he disavowed any relationship between TX Trading and DVG merely because Menachem Ichilevici may have operated his business out of his father's house before the two apparently began living together.

*Second*, ZAGG tells us that "TX Trading also admitted that it sells mobile phone accessories, the exact category of goods sold on the Mac N' Cheese Amazon Storefront and at issue in this case." Pla. Response at 21. But this doesn't mean that TX Trading sells *ZAGG* mobile-phone accessories— and this argument ignores Beny Ichilevici's testimony that TX Trading only sells Original Equipment Manufacturer ("OEM") accessories (*i.e.*, products from Apple, Samsung, etc.). *See* Deposition of Beny Ichilevici ("B. Ichilevici Tr.") [ECF No. 327-9] ¶¶ 11–18 ("A: [The only accessories TX Trading sells are] OEM accessories from batteries, chargers, but everything OEM. Nothing -- nothing non-OEM. Q I understand what OEM means, but for the record, what do you mean by OEM? A Original accessories, original batteries, original chargers from Samsung, from -- from Apple itself. Not -- nothing with other brands that's not the original manufacturers."). And ZAGG has no evidence that this testimony is in any way false. *See Harrell v. City of Opa-Locka*, 2022 WL 898565, at *11 (S.D. Fla. Mar. 28, 2022) (Altman, J.) ("[A] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

*Finally*, ZAGG claims that, because Beny Ichilevici had never heard of ZAGG's sub-brands, he can't be *sure* that he hasn't sold their products. *See* Pla. Response at 23 ("[H]ow can TX Trading affirmatively assert that it has never sold ZAGG products when it does not even know what products ZAGG sells?"). But Beny Ichilevici was clear that he knows he doesn't sell these brands' products

because TX Trading *only sells* OEM accessories. *See* B. Ichilevici Tr. ¶¶ 11–18. And it's undisputed that ZAGG products *aren't* OEM accessories. *See* PSMF ¶ 1 ("ZAGG markets and sells its products in the United States under the ZAGG, Invisible Shield, IFROGZ, mophie, Gear4, and BRAVEN brands."); PSMF Response ¶ 1 ("Undisputed.").

In short, DVG has introduced sworn testimony that TX Trading is *not* related to DVG and has never sold *any* ZAGG products. Since ZAGG has utterly failed to rebut this evidence, DVG's request for summary judgment as to TX Trading is **GRANTED**.[14]

Finally, and relatedly, DVG asks us to sanction ZAGG by ordering it to pay TX Trading reasonable expenses, including attorney's fees, because ZAGG has inappropriately forced TX Trading to remain in this case "for more than two years." Def. MSJ at 32. But Rule 11 makes clear that "[a] motion for sanctions *must be made separately from any other motion* and must describe the specific conduct that allegedly violates Rule 11(b)," FED. R. CIV. P. 11(c)(2) (emphasis added), so we **DENY** DVG's procedurally improper request for sanctions.

## CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

---

[14] DVG also asks us to enter summary judgment on Count III of the SAC because "piercing the corporate veil and alter ego are theories of liability, not independent causes of action." Def. MSJ at 30–31. While we agree with DVG that piercing the corporate veil "may not be plead as a distinct cause of action," *MerchACT, LLC v. Ronski*, 2022 WL 3682207, at *6 (S.D. Fla. Jan. 13, 2022) (Dimitrouleas, J.), we can't grant "summary judgment" on this theory of liability because DVG hasn't argued that piercing the corporate veil *as to DVG* would be inappropriate, *see generally* Def. MSJ. The proper time for DVG to raise this issue would've been on a motion to strike Count III from ZAGG's SAC. In any event, we won't order ZAGG to amend its SAC to remove this redundant count because ZAGG sufficiently pled its request that we pierce the corporate veil in the body of its SAC. *See, e.g.*, SAC ¶ 23 ("Upon information and belief, Defendants DVG Trade and TX Trading are the alter egos of Defendant Ichilevici. Accordingly, the corporate form and legal distinction of DVG Trade and TX Trading should be disregarded, and a judgment against Defendants DVG Trade and TX Trading constitute judgment against Defendant Ichilevici."). This isn't to say that we will (or won't) pierce the corporate veil—that's an issue we'll decide later. It just means that we won't fault ZAGG for incorrectly labelling its corporate-veil request as a "count."

38

1. The Plaintiffs' Motion for Summary Judgment [ECF No. 308] is **GRANTED in part** and **DENIED in part**.

   a. Summary judgment is **ENTERED** for the Plaintiffs on Counterclaims II, IV, and V of the Defendants' Counterclaims [ECF No. 41].

   b. The Plaintiffs' request for summary judgment on their affirmative claims is **DENIED**.

2. The Defendants' Motion for Summary Judgment [ECF No. 317] is **GRANTED in part** and **DENIED in part**.

   a. Summary Judgment is **ENTERED** for the Defendant TX Trading, Inc. *only*.

   b. The Defendants' request for summary judgment as to all other Defendants is **DENIED**.

   c. The Defendants' request for sanctions is **DENIED**.

   d. The Defendants' request for summary judgment on their counterclaims is **DENIED as moot**.

3. The Clerk is directed to **TERMINATE** TX Trading, Inc., Merril Longmore, and Brendan Buckner as parties to this case.

   **DONE AND ORDERED** in the Southern District of Florida on January 7, 2026.

   _____

   **ROY K. ALTMAN**
   **UNITED STATES DISTRICT JUDGE**

cc:      counsel of record